2002 SD 94

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Thomas John TUTTLE, Defendant and Appellant.**

No. 22025.

Supreme Court of South Dakota.

Considered on Briefs April 22, 2002.

Decided July 31, 2002.

**24**

Mark Barnett, Attorney General, Frank Geaghan, Assistant Attorney General, Pierre, for plaintiff and appellee.

Paul E. Pietz of Minnehaha County Public Defender's Office, Sioux Falls, for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] The defendant was taken into police custody for questioning. During interrogation, the detective threatened that the defendant's failure to cooperate would be noted in the police report, suggesting that refusal to admit guilt might result in harsher treatment. Because a person cannot be coerced into foregoing a Fifth Amendment right, and because this threat plainly caused the defendant to confess, we conclude under the totality of circumstances that the confession was obtained involuntarily and should be suppressed. We reverse and remand for a new trial.

### A.

### Background

[¶ 2.] After having several drinks at a party on Monday, October 30, 2000, Thomas John Tuttle and his friend Bereket Emehezian drove to the residence of Tuttle's grandmother, a mobile home at the Park View Trailer Court, in Sioux Falls, South Dakota. Soon after arrival, Tuttle and Emehezian got into an argument. A shoving match ensued. Various residents of the trailer court came out to watch. One of them succeeded in separating the two, whereupon Emehezian got into his car and sped away. Tuttle chased him on foot as far as the entrance and then walked back to his grandmother's home.

[¶ 3.] Shortly afterwards, law enforcement officers arrived on the scene to investigate. Finding nothing unusual, they were preparing to leave when Tuttle's grandmother approached the officers and requested that they eject some people she did not want in her home. Upon entering her trailer, the officers found Terrance Yellow Earrings, leaning against the kitchen sink, bleeding profusely. There was a recently washed paring knife in the sink.

In addition to Yellow Earrings and Tuttle's grandmother, the officers found three other people in the trailer: Tuttle's mother (the girlfriend of Yellow Earrings), and Tuttle's two uncles. Tuttle himself was outside the trailer, leaning up against a vehicle, when the officers arrived. After Yellow Earrings received first aid from the officers, he was taken by ambulance to the hospital. A medical examination revealed that he had sustained eleven stab wounds.

[¶ 4.] None of the people found in the trailer claimed to know who had committed the stabbing. Accordingly, the police took them all, as well as Tuttle, in for questioning. Under interrogation by Detective Thaddeus Openhowski, Tuttle admitted to having stabbed Yellow Earrings three times. Tuttle was charged with aggravated assault in violation of SDCL 22–18–1.1(2). In the jury trial, Yellow Earrings was the only eyewitness who testified on the identity of his assailant. No one else present during the assault appeared as witnesses. During the course of his testimony, it emerged that Yellow Earrings was, at the time of trial, incarcerated on a charge of tampering with a witness involved in this case. The paring knife was admitted into evidence, over defense objection. The jury found Tuttle guilty. The court sentenced him to six years in the penitentiary, noting that this relatively light punishment was appropriate to Tuttle's age (eighteen) and his prospects of rehabilitation.

[¶ 5.] After sentencing, Tuttle moved for a new trial, arguing that fresh evidence had arisen, namely that Tuttle's mother, Carol, had assaulted Yellow Earrings and had inflicted stab wounds once before and once after the assault here in question, and that the circumstances surrounding those incidents were sufficiently similar that their admission into evidence would proba-

bly have led to Tuttle's acquittal. The court denied Tuttle's motion. On appeal, Tuttle raises the following issues: (1) Did the trial court err in admitting into evidence his statements to police? (2) Did the trial court err in admitting into evidence a knife found at the scene of the crime? (3) Did the trial court err in denying his motion for a new trial?

## B.

### Miranda Waiver

[¶ 6.] Tuttle moved to suppress statements he made during his interrogation on the grounds that (a) he did not waive his *Miranda* rights, and (b) his admissions were involuntary. The circuit court denied his motion. Tuttle argues that the court committed reversible error in so ruling. We give deference to pure fact findings on such questions as whether the proper warnings were actually given, but we review *de novo* a trial court's ruling on the question whether a defendant knowingly, intelligently, and voluntarily waived *Miranda* rights. *State v. Stanga*, 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488.

[¶ 7.] When a defendant moves to suppress statements taken during a custodial interrogation, the trial court must conduct a hearing outside the presence of the jury, preferably before trial. SDCL 19–9–9. In this hearing, the prosecution must show that the defendant voluntarily, knowingly, and intelligently waived *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966). For a waiver determination, a court should consider a defendant's age, experience, intelligence, and background, including familiarity with the criminal justice system, as well as physical and mental condition.[1] *Fare v.*

1. Tuttle had been consuming alcoholic bever- ages, and intoxication is another factor to be

*Michael C.*, 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197, 212 (1979).

[¶ 8.] The State must prove a waiver of *Miranda* rights only by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 485 (1986) (reversing Colorado's higher standard of clear and convincing evidence). It is resolved now, under the recent decision in *Dickerson v. United States*, that *Miranda* is a federal constitutional requirement, reviewable under federal standards. 530 U.S. 428, 432, 120 S.Ct. 2326, 2329, 147 L.Ed.2d 405, 411 (2000). Therefore, we will no longer hold the State to a higher burden of proof under the federal constitution. *See, e.g., State v. Faehnrich*, 359 N.W.2d 895, 898 (S.D.1984) (imposing beyond-a-reasonable-doubt standard).

[¶ 9.] An express waiver is not necessary, but a waiver cannot be presumed from a defendant's silence or confession alone. *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. Explicitness of a waiver is a factor for consideration. *See, e.g., U.S. v. Gupta*, 183 F.3d 615, 618 (7thCir.1999) (valid waiver because defendant signed written waiver and repeated his statement twice after *Miranda* rights were given); *Derrick v. Pe-*

*terson*, 924 F.2d 813, 815–16, 821 (9thCir.1990) (valid waiver because written waiver signed after *Miranda* rights were explained three or four times even though defendant was sixteen years old with a low I.Q.); *U.S. v. Hack*, 782 F.2d 862, 866 (10thCir.1986) (valid waiver when each defendant signed two different *Miranda* waivers because express waiver is "usually strong proof of the validity of that waiver"). In addition, a suspect may partially waive *Miranda* rights. *Connecticut v. Barrett*, 479 U.S. 523, 529–30, 107 S.Ct. 828, 832, 93 L.Ed.2d 920, 928 (1987). To prove a valid waiver, the State must show that (1) the relinquishment of the defendant's rights was voluntary and (2) the defendant was fully aware that those rights were being waived and of the consequences of waiving them. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986).

[¶ 10.] On the question whether Tuttle knowingly, intelligently, and voluntarily waived his *Miranda* rights, we quote the crucial passage in the initial part of his interview:

Detective (D): [Having read Tuttle the *Miranda* warnings from a card, asks] Do you understand these rights?

Tuttle (T): Yeah.

considered in the totality of the circumstances, both on waiver and voluntariness. In the suppression hearing, Detective Openhowski testified that "It was obvious to me he had been drinking and he was probably intoxicated at the time...." But it is unclear whether the detective was referring to the time of the stabbing incident or the time of the interview. In contrast, at trial the detective testified that during the interview. "I believe that he was under the influence of alcohol. Legally intoxicated, I can't say that." Accordingly, the circuit court found with respect to the interrogation that "although there is some testimony that [Tuttle] had been consuming alcoholic beverages earlier in the evening, it's uncertain as to how

much or when that occurred or whether or not he was under the influence at the time." The court concluded that "there is simply no evidence to suggest that the alcohol consumption in this case overcame or affected his ability to understand his constitutional rights or waive those rights." We cannot say that the court's factual finding was clearly erroneous. In viewing the taped interrogation ourselves, it appears that Tuttle was coherent and responsive during questioning. *See, e.g., U.S. v. Schwensow*, 151 F.3d 650, 660 (7th Cir. 1998) (valid waiver because court did not find defendant impaired by effects of withdrawal from alcohol or anti-depressant drug at time of interview).

D: Do you wish to waive these rights and talk to me at this time?

T. No.

D: No, what? You don't want to talk to me?

T: I don't want to waive the rights.

D: You want to waive the rights?

T: No. You said you want to talk; let's talk.

D: OK. Well, let me, let me, OK, cuz, yeah, I understand that, you understand your rights, correct?

T: Yeah.

D: Do you wish to waive these rights and talk to me at this time?

T: No, no.

D: You don't want to talk to me?

T: Nah, I don't want to waive my rights. I want to talk to you so I can get the hell out of here.

D: OK. We are getting confused here, OK? In other words, if you don't want to talk to me, then say, "I don't want to talk to you." But if you want to waive your rights, which means, "yes, I understand all that, but I do want to talk to you," then you have to say, "yes, I want to talk with you."

T: How do I say, "I want to talk to you so I can get the hell out of here"?

D: OK. So you, do you wish to waive these rights and do you want to talk to me at this time?

T: Yeah.

D: There you go, that's what you're, you're sure that's what you want to do?

T: I just want to get the hell out of here.

D: So you can get the hell out of here. OK; let me go put this card away.

In this colloquy, Tuttle states that he does *not* want to waive his rights, but he *does* wish to talk with the detective. Thus, at that point, it was unclear whether Tuttle's refusal to waive *Miranda* rights amounted to an unequivocal invocation of those rights.

[¶ 11.] The detective later testified on this exchange: "During the reading of the *Miranda* warnings [Tuttle] was saying 'no,' but I think he wanted to talk. He was not understanding the exact questioning." The trial court found that "[a]t all times the defendant expressed a willingness, even a desire, to talk to the police about what had happened." But Tuttle's *willingness* or *desire* to talk is not equivalent to an *understanding* that talking to the detective was tantamount to renouncing his Fifth Amendment rights. On this aspect, the detective testified: "*Certainly*, if I had any indication that I didn't think he wanted to talk, I certainly would not have interviewed him." Whether Tuttle wanted to talk is a necessary, but not a sufficient condition for waiver: waiver must be made knowingly and intelligently.[2]

[¶ 12.] If the invocation of *Miranda* rights is ambiguous or equivocal, the United States Supreme Court has held that further questioning is permissible. *See Davis v. U.S.*, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 371 (1994) (clarity of invocation of *Miranda* rights is an objective determination). In *Davis*, the

**2.** As the United States Supreme Court explained in *Edwards v. Arizona*, waivers of Fifth Amendment rights after *Miranda* warnings have been given "must not only be voluntary, but must also constitute a knowing and intelligent abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378, 385 (1981) (citation omitted).

Court considered whether the statement "[m]aybe I should talk to a lawyer" was sufficient to invoke a suspect's right to counsel, when uttered approximately an hour and a half into interrogation. Before questioning, the suspect had been read the *Miranda* warnings and indicated that he understood those rights and agreed to talk. The Court held that an equivocal request for counsel is insufficient to invoke the right to counsel and does not require the interrogators to cease questioning or limit further questions to those seeking clarification. *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371–72.

[¶ 13.] To provide a "bright line" standard necessary for effective law enforcement and to avoid transforming procedural safeguards into "wholly irrational obstacles" to police investigations, a person subjected to custodial interrogation must invoke the right to counsel "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371. The Court added that, although not required, "it will often be good police practice" for officers to clarify a suspect's ambiguous statement. *Id.* at 461, 114 S.Ct. at 2356, 129 L.Ed.2d at 373.

[¶ 14.] The *Davis* holding obviously applies to instances where suspects attempt to invoke *Miranda* rights after a knowing and voluntary waiver of those rights. *Davis*, in sum, applies to an equivocal postwaiver invocation of rights. For an initial waiver, however, the State still bears "a heavy burden to demonstrate that the defendant knowingly and intelligently waived" *Miranda* rights. *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. As the Utah Supreme Court recognized, "[t]he questions of waiver of *Miranda* rights and of postwaiver invocation of those rights are entirely separate."

*State v. Leyva*, 951 P.2d 738, 743 (Utah 1997) (*citing Smith v. Illinois*, 469 U.S. 91, 98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488, 495–96 (1984)). The *Leyva* Court wrote that with an ambiguous waiver in the initial advisement:

> After an officer has informed a suspect of his *Miranda* rights and has determined that the suspect understands those rights, the officer must then determine if the suspect is willing to waive those rights and answer questions. If the suspect responds ambiguously or equivocally, the officer must then focus on clarifying the suspect's intent.
>
> * * *
>
> "A simple, straightforward effort to clarify the request is appropriate." If the officer has properly attempted to clarify the suspect's response and the suspect continues to respond ambiguously or equivocally, a valid implied waiver may still be found after a review of the totality of the circumstances.

*Id.* at 744 (internal citation omitted). We find persuasive the *Leyva* Court's distinction between an equivocal response to an initial *Miranda* advisement and an equivocal postwaiver invocation. Accordingly, when an officer receives an equivocal response to the reading of *Miranda* rights, the officer must limit questioning to clarifying the subject's response.

[¶ 15.] Did the detective here properly clarify Tuttle's response? When Tuttle said, "I don't want to waive my rights. I want to talk to you so I can get the hell out of here," the detective responded:

> D: OK. We are getting confused here, OK? In other words, if you don't want to talk to me, then say, "I don't want to talk to you." But if you want to waive your rights, which means, "yes, I understand all that, but I do want to talk to you,"

then you have to say, "yes, I want to talk with you."

T: How do I say, "I want to talk to you so I can get the hell out of here"?

D: OK. So you, do you wish to waive these rights and do you want to talk to me at this time?

T: Yeah.

 [¶ 16.] There is no prescribed ritual for waiving or invoking Fifth Amendment rights. *See North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979). A *Miranda* waiver may be inferred from the defendant's understanding of the rights coupled with a course of conduct reflecting a desire to give up those rights. *Id.,* 441 U.S. at 373, 99 S.Ct. at 1757, 60 L.Ed.2d at 292. *See also State v. Rhines*, 1996 SD 55, ¶ 35, 548 N.W.2d 415, 429 (citing *United States v. Betts*, 16 F.3d 748, 763 (7th Cir. 1994) (citing *Fare*, 442 U.S. at 724–25, 99 S.Ct. at 2571–72, 61 L.Ed.2d at 212 (1979); *Butler*, 441 U.S. at 373, 99 S.Ct. at 1757, 60 L.Ed.2d at 292)). A defendant's *understanding* of *Miranda* rights is an essential component to inferring waiver. "The requirement of warnings and waiver of rights is ... fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." *Miranda,* 384 U.S. at 476, 86 S.Ct. at 1629, 16 L.Ed.2d at 725.

[¶ 17.] In *State v. Pilcher*, the defendant stated at the outset of interrogation that he thought he should have an attorney. 472 N.W.2d 327, 331 (Minn.1991).

In response, the officers told him that they could not speak with him if he wanted an attorney. Pilcher protested that he wished to tell his side of the story, but the officers repeated that they could not speak with him if he wished to speak with an attorney. Upon Pilcher's further insistence that he be allowed to tell his side of the story, the officers responded that they could talk *only if* he agreed to waive his Fifth Amendment rights. At that point, Pilcher agreed to waive his rights and make a statement. The Minnesota Supreme Court ruled that Pilcher had thereby waived the right to counsel that he had invoked just before.

 [¶ 18.] The situation in our case is similar to that in *Pilcher*.[3] Although the detective presented Tuttle with a compound question, to which Tuttle's one-word answer might seem necessarily ambiguous, the detective's question encapsulated the essence of waiving the right to remain silent: by agreeing to answer questions, Tuttle was effectively waiving his *Miranda* rights. The circuit court found that Tuttle "did not express any confusion about his rights. He indicated he understood those rights." In our experience as judges, we cannot be unmindful of the prospect that Tuttle, recently released from jail on another charge of aggravated assault, wanted to manipulate the *Miranda* advisement process to suit his own purpose, i.e., to get out of jail. Our viewing of the taped interview reveals that Tuttle was not perplexed about his rights, and we conclude that a reasonable officer, in light of the circumstances, would have understood that by

**3.** *Pilcher* is similar for another reason: the right to silence is not generally protected by a *per se* rule, requiring police to cease questioning immediately upon an explicit request for counsel. In contrast, in *Michigan v. Mosley,* the Supreme Court made clear that a suspect who invokes the right to silence in response to police questioning may again be subject to police-initiated interrogation so long as the police "scrupulously honor[ ]" the suspect's choice. 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975). *Compare Mosley,* 423 U.S. at 101–04 & n.10, 96 S.Ct. at 325–26 & n.10, 46 L.Ed.2d at 319–21 & n.10 *with Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85, 68 L.Ed.2d at 385–87.

agreeing to answer questions, Tuttle knew he was waiving his *Miranda* rights.

[¶ 19.] On the whole, we think the detective adequately clarified Tuttle's intent. Tuttle thereafter voluntarily and willingly agreed to waive his *Miranda* rights after indicating an understanding of those rights. To hold police officers to some higher requirement of providing an exhaustive explanation of the *Miranda* warnings would impose an unrealistic burden. *State v. Norfolk,* 221 Neb. 810, 381 N.W.2d 120, 127 (1986). During the interview, furthermore, Tuttle's responses to the detective's questions indicate that Tuttle well knew that any admission would be incriminating. Considering the totality of circumstances and applying the State's burden of showing waiver only by a preponderance of the evidence, we uphold the circuit court's conclusion that Tuttle knowingly, intelligently, and voluntarily waived his *Miranda* rights.

## C.

### Voluntariness of Confession

[¶ 20.] We turn to the question whether the confession itself was voluntary, keeping in mind that the validity of a *Miranda* waiver of rights and the voluntariness of an admission are separate but parallel inquiries.[4] *Stanga,* 2000 SD 129 at ¶ 8, 617 N.W.2d at 488 (citation omitted). Although there are often subsidiary factual questions deserving deference, the voluntariness of a confession is ultimately a legal question. *Miller v. Fenton,* 474 U.S. 104, 116, 106 S.Ct. 445, 452–53, 88 L.Ed.2d 405, 414–15 (1985). On appeal, we "examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Beckwith v. United States,* 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1, 8 (1976) (quoting *Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895, 898 (1966)). The voluntariness of a confession depends on the absence of police overreaching. *Connelly,* 479 U.S. at 170, 107 S.Ct. at 523, 93 L.Ed.2d at 486. Confessions are not deemed voluntary if, in light of the totality of the circumstances, law enforcement officers have overborne the defendant's will. *Haynes v. Washington,* 373 U.S. 503, 513–14, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513, 520–21 (1963). *See also State v. Frazier,* 2001 SD 19, ¶ 20, 622 N.W.2d 246, 255 (citing *State v. Smith,* 1999 SD 83, ¶ 36, 599 N.W.2d 344, 352).

[¶ 21.] The burden of proving the voluntariness of a confession is the same as the burden for showing the voluntariness of a *Miranda* waiver. *Connelly,* 479 U.S. at 169–70, 107 S.Ct. at 523, 93 L.Ed.2d at 486. The State must establish the voluntariness of a confessant's admission by a preponderance of the evidence. *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377, n.5, 467 U.S. 431, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, n.5, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377, 387–88, n.5 (1984); *United States v. Matlock,* 415 U.S. 164, 178, 94 S.Ct. 988, 39 L.Ed.2d 242, n.14, 415 U.S. 164, 94 S.Ct. 988, 996, 39 L.Ed.2d 242, n.14, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242, 253, n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evi-

---

4. The *Supreme Court in Colorado v. Connelly* held that "[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context." 479 U.S. 157, 169–70, 107 S.Ct. 515, 523, 93 L.Ed.2d 473, 486 (1986). Thus, once a court concludes that a defendant's confession was voluntary under the Fourteenth Amendment, it follows that the defendant's waiver of *Miranda* rights was also voluntary. But the opposite is not necessarily true.

dence...."); *Lego v. Twomey*, 404 U.S. 477, 488, 92 S.Ct. 619, 626, 30 L.Ed.2d 618, 627 (1972). We now expressly abandon our prior standard holding the State to a higher burden in suppression hearings.[5] As the United States Supreme Court said in *Lego*:

> [E]xclusionary rules are very much aimed at deterring lawless conduct by police and prosecution, and it is very doubtful that escalating the prosecution's burden of proof in ... suppression hearings would be sufficiently productive in this respect to outweigh the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence.

404 U.S. at 489, 92 S.Ct. at 626, 30 L.Ed.2d at 627. Voluntariness determinations have "nothing to do with the reliability of jury verdicts; rather, [they are] designed to determine the presence of police coercion." *Connelly*, 479 U.S. at 168, 107 S.Ct. at 522, 93 L.Ed.2d at 485.

[¶ 22.] Once suspects in custody are properly advised of, and agree to waive, their *Miranda* rights, they may be freely questioned as long as interrogators do not obtain a confession through coercion. With coercive police conduct as a "necessary predicate" to finding a defendant's admission involuntary, we look at the totality of the circumstances under which the coercion was used. *See Connelly*, 479 U.S. at 167, 107 S.Ct. at 522, 93 L.Ed.2d at 484. The factual inquiry centers on (1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity to resist that pressure. *Mincey v. Arizona*, 437 U.S. 385, 399–401, 98 S.Ct. 2408, 2417–18, 57 L.Ed.2d 290, 304–306 (1978). On the latter factor, we examine such concerns as the defendant's age; level of education and intelligence; the presence or absence of any advice to the defendant on constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; the use of psychological pressure or physical punishment, such as deprivation of food or sleep; and the defendant's prior experience with law enforcement officers and the courts. Finally, "[d]eception or misrepresentation by the officer receiving the statement may also be factors for the trial court to consider; however, the police may use some psychological tactics in interrogating a suspect." *State v. Darby*, 1996 SD 127, ¶ 31, 556 N.W.2d 311, 320.

[¶ 23.] A confession is "obtained" involuntarily if police overreaching is the actual moving cause for the confession. *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194, 197 (1976). It must be more than a "but for" type causation, for "causation in that sense has never been the test of voluntariness."[6] *Id.*, 429 U.S. at 30, 97 S.Ct. at 203, 50 L.Ed.2d at 197. Put from another perspective, even with police coercion, a confession cannot be held to have been *obtained* by the exertion of such improper influence, unless it is the direct cause for the confession.[7]

---

5. The beyond a reasonable doubt standard still applies, of course, to the fact finder's determination at trial whether an admission or confession was made by the defendant and whether the statement is true or false, in whole or in part. *State v. Jerke*, 73 S.D. 64, 38 N.W.2d 874 (1949); South Dakota Pattern Jury Instructions (Criminal) 1–14–3.

6. "If the test was whether a statement would have been made *but for* the law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action." *U.S. v. Leon Guerrero*, 847 F.2d 1363, 1366, n.1 (9th Cir. 1988) (emphasis added).

7. We have sometimes quoted the following, rather confusing, test: "the question we must

[¶ 24.] The initial focus of Tuttle's appeal on voluntariness is the effect of the detective's lies in telling him that his mother and grandmother were then "across the hall" and that both had stated that he had stabbed Yellow Earrings. Tuttle advances the novel theory that these lies amounted to a "biological lie-detector test": precisely because his mother and his grandmother, of all the people in the world, were the ones he could always count on to stand by him and to tell him the truth, the detective's representations were equivalent to the—*per State v. Faller*—"psychological rubber hose" that a polygraphed person faces.[8] 88 S.D. 685, 688, 227 N.W.2d 433, 435 (1975). However, Tuttle cites no authority for this theory; therefore, the issue of voluntariness, insofar as his claim depends on that theory, is deemed waived under SDCL 15–26A–60(6). *See State v. Pellegrino*, 1998 SD 39, ¶ 22, 577 N.W.2d 590, 599. Aside from the lack of authority, our review of the videotape reveals that these false statements made little difference in the face of Tuttle's insistence that he did not commit the stabbing. In fact, he maintained repeatedly that because his mother was the victim's girlfriend, he would expect that she would side with the victim.

[¶ 25.] Tuttle also argues that his confession was involuntary for an entirely different reason, namely, his receiving an explicit threat that his failure to cooperate would be used against him. In particular, the detective told Tuttle that his report could be written to make things look good for Tuttle or that "I'm gonna have to write it up that you're not cooperating, you're being a real jerk about it." In this context, it is well to remember that an admission is not voluntary unless it is " 'the product of a rational intellect and a free will.' " *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242, 249 (1960).

[¶ 26.] The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Involuntary confessions can encompass a broad range, including not only the familiar types of coerced statements obtained by actual or threatened violence, but also confessions extracted by psychological ploys or improper interrogation techniques deemed inconsistent with the right to be free from compelled self-incrimination. In some instances, however, "direct promises that officers would tell the prosecutor [whether] defendant cooperated are permissible, but promises that officers would see to it that a defendant would go to prison if he failed to cooperate are not." *State v. Tapia*, 159 Ariz. 284, 767 P.2d 5, 11 (1988) (citing *United States v. Tingle*, 658 F.2d 1332, 1336, n.n.4–5 (9th Cir.1981)). In *People v. Brommel*, the po-

---

answer is not whether the interrogators' statements were the cause of [the suspect's] confession, but whether those statements were so manipulative or coercive that they deprived [the suspect] of his ability to make an unconstrained, autonomous decision to confess." *State v. Dickey*, 459 N.W.2d 445, 448 (S.D. 1990). This quotation came originally from *Miller v. Fenton*, 796 F.2d 598, 605 (3rd Cir. 1986), but the *Miller* court gave no authority for this proposition.

**8.** The *Faller* court explains:

A defendant, when suddenly faced with the impersonal accuracy of a machine, may believe it is safer to confess and place himself at the mercy of the law than to lie to the examiner and sacrifice any possibility of leniency. Under circumstances such as this we find it difficult to believe that a confession is voluntary unless it can be shown the defendant knows his constitutional rights and knows that his interest cannot be harmed by exercising those rights.
88 S.D. at 688, 227 N.W.2d at 435.

lice told the suspect that unless he changed his story (he had denied injuring his daughter) they would write "liar" on their report to the judge. 56 Cal.2d 629, 633–34, 364 P.2d 845, 15 Cal.Rptr. 909 (1961) (overruled on other grounds by *People v. Cahill*, 5 Cal.4th 478, 494, 853 P.2d 1037, 1048, 20 Cal.Rptr.2d 582, 593 (1993)) (Cahill I). The court found that this conduct was both a threat and an implied promise of leniency, rendering the confession inadmissible.[9] Other decisions have held likewise. In *U.S. v. Harrison*, 34 F.3d 886 (9th Cir.1994), the court wrote that "there are no circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor." Applying this same principle, the Alabama Supreme Court in Ex parte Matthews, held that the following comments to a suspect were coercive threats: "You know there's two ways to go about things, either you go about it and you don't cooperate and the judge knows that you didn't and the district attorney knows you didn't or you turn around and you did cooperate, you know. . . . I can go back and tell the district attorney, [defendant] cooperated with me or I can go back and tell the district attorney that [defendant] did not cooperate with me." 601 So.2d 52, 52–53 (Ala. 1992).

[¶ 27.] In *Tingle*, the court explained the distinction between encouraging cooperation and threatening for failure to cooperate:

> Although it is permissible for an interrogating officer to represent, under some circumstances that the fact that the defendant cooperates will be communicated to the proper authorities, the same cannot be said of a representation that a defendant's failure to cooperate will be communicated to a prosecutor. Refusal to cooperate is every defendant's right under the fifth amendment. Under our adversary system of criminal justice, a defendant may not be made to suffer for his silence. Because there is no legitimate purpose for the statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations.

658 F.2d at 1336, n.5. Law enforcement agents told Tingle that if she refused to cooperate, they would inform the prosecutor that she was "stubborn" and "hard headed."[10] We acknowledge, though, that the threats in *Tingle* were far more egregious than the one here. There, government agents preyed on "the maternal instinct and inculcate[d] fear in a [young] mother that she would not see her children in order to elicit cooperation." *Id.* at 1336. From the totality of the circumstances, the

9. The dissenters misapprehend our citation to these cases. Whatever tests these courts ultimately used to decide whether a coerced confession should be suppressed, the fact remains that in each of those cases the threats used by the law enforcement officers were coercive. Those courts then employed a different standard than we apply here to determine whether the confessions should be suppressed. Here, we use the totality of circumstances test in concluding that the officer's threat to the defendant caused his confession and overbore his will, thus rendering the confession inadmissible.

10. Unlike the defendants in *Tingle* and in *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), another case in which a threat by interrogators rendered a confession involuntary, Tuttle had been charged with a felony previously (though the charges were later dropped), but his experience with the courts was not so extensive that he could be expected to know that the threat leveled against him could not be carried out. On the contrary, much of the interrogation involved Tuttle's worry that his brother was facing penitentiary time for a crime Tuttle did not believe his brother committed.

court concluded that the threats were "patently coercive," causing "Tingle to fear that, if she failed to cooperate, she would not see her young child for a long time." *Id.*

[¶ 28.] The line between making threats and simply informing suspects what the natural consequences of their acts are likely to be can sometimes be narrow, but that line must remain distinct. Merely telling suspects that they should think about the consequences of obstructing the investigation, or saying that if they do not cooperate the prosecutor will look upon their cases differently, or even suggesting that, unless they cooperate, the child victims of their sexual assaults would be forced to testify and would suffer great trauma, is not coercive. *State v. Deets*, 187 Wis.2d 630, 523 N.W.2d 180, 182, 183 (1994). These remarks are reasonable

predictions, not coercive conduct. *Id.* at 183. Moreover, receiving threats from an interrogator should be distinguished from having a subjective fear that failure to confess will have adverse consequences. *See State v. P.Z.*, 152 N.J. 86, 703 A.2d 901, 916 (1997). A subjectively created state of mind is not dispositive of the question whether the will was overborne and the capacity for self-determination was critically impaired. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973).

[¶ 29.] In our case, the circuit court did not address the question of the voluntariness of Tuttle's statements in response to the detective's threat; rather, in conclusory fashion, the court ruled from the bench at the suppression hearing that Tuttle's statements were voluntary.[11] Yet,

11. The trial court entered oral findings on the record with respect to three issues, Tuttle's *Miranda* waiver, the voluntariness of Tuttle's confession, and Yellow Earrings' "dying declaration." No written findings of fact and conclusions of law were entered, and the State proposed none. We have often expressed our preference for written, separate, appropriate, and specific findings of fact and conclusions of law in order to aid appellate review and to promote accuracy. *State v. Flegel*, 485 N.W.2d 210, 213 (S.D.1992).

The dissenters take issue with our statement that the court's ruling on the voluntariness of Tuttle's confession was conclusory. The trial court's remarks on the question of voluntariness are as follows:

> [A]t all times the defendant expressed a willingness, even a desire, to talk to the police about what had happened. The police, as far as I'm concerned in this case, used legitimate police tactics. In an interview it is okay, as I read the cases that I have read recently, for police to tell small lies in their interrogation provided that those aren't so serious that they overcome the will of the defendant, and in this particular case the small lies that were being told, in my mind, do not by themselves do that. The defendant had sufficient education to be able to understand his rights. Although

there is some testimony that he had been consuming alcoholic beverages earlier in the evening, it's uncertain as to how much or when that occurred or whether or not he was under the influence at the time. It would have been better in this case had the police officers administered a PBT or something like that to the defendant so they'd be able to say with some certainty that at the time that the interview took place [ ] he was no longer under the influence or had a .13 or some relatively low level, but, nevertheless, there is simply no evidence to suggest that the alcohol consumption in this case overcame or affected his ability to understand his constitutional rights or waive those rights.

> I conclude that the defendant freely and voluntarily gave up his rights to an attorney and to remain silent and talk with the officers, and the Motion to Suppress the statement is denied.

A candid reading of these remarks shows that the trial court addressed the following points: (1) the defendant's supposed willingness, even desire, to talk with the police; (2) small lies that the police told; and (3) the possibility that Tuttle may have been impaired because of his consumption of alcohol. The first point is conclusory: the court simply made no reference to the threats the officer made if the

the factual circumstances surrounding Tuttle's statements to the detective are not in dispute. Only the legal question of voluntariness is before us. Exactly what was the threat that the detective made? To quote again from the interview, the detective's second alternative was: "I'm gonna have to write it up that you're not cooperating, you're being a real jerk about it." The unmistakable message was, if Tuttle refused to confess, then the report to the authorities would be written to discourage any leniency, meaning Tuttle would likely suffer more severely for not confessing. This was coercive. The videotape of the interview reveals, without doubt, that the detective's threat occasioned Tuttle's admission of guilt: Tuttle, already weeping at that point, responded to it with these words: "OK. I stabbed him. Whatever. Shit."

▮▮▮▮ [¶ 30.] As we have said, it is not enough to show that threats were made to induce a confession. It must also be shown in the totality of circumstances that the suspect's will was overborne and that the overreaching police conduct was causally related to the confession. A suspect's will is overborne if the confession is not the product of a free and unconstrained choice. Tuttle's demeanor and response as we viewed it on the tape demonstrated that the threat found its mark. *See Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057–58 (1961). The message was clear: if Tuttle failed to cooperate he would pay the consequences; he would be treated less favorably. Concededly, this was not the worst threat imaginable, but our Supreme Court has "held inadmissible even a confession secured by so mild a whip as the refusal, under certain circumstances, to allow a suspect to call his wife until he confessed." *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653, 659 (1964) (citing *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963)).

[¶ 31.] Reviewing the relevant facts, we conclude that the following weigh in favor of adjudging Tuttle's statement voluntary: there was no evidence that Tuttle lacked sufficient education or intelligence to understand the alternatives open to him; the length of his detention was less than an hour; the questioning, though somewhat repetitious, was not prolonged through several sessions; he did not suffer physical punishment or deprivation. On the other hand, we find that the following factors weigh against finding his statement voluntary: he was in custody and interrogated in a holding cell at 2:30 a.m.; he was under the influence of alcohol; he was eighteen at the time; he was deceived about statements of eyewitnesses; and, as explained earlier, he was subjected to an implied threat of more serious consequences if he refused to admit guilt. Weighing all these elements, the scale tilts toward holding the confession involuntary.

▮▮▮▮ [¶ 32.] We conclude that the trial court erred in finding that Tuttle's statement was given voluntarily and, thus, we rule that, under the totality of circumstances in this case, the statement is inad-

---

defendant failed to cooperate. The second point refers to Tuttle's "psychological rubber hose" theory, which we reject here. Neither of those nor the third addresses the concern that we have explained at length, namely, whether the threat to reveal Tuttle's noncooperation *elicited* his confession.

It is also important to point out that the dissenters are incorrect in implying that we are to give deference to the trial court's finding of voluntariness. Our standard of review is *de novo,* not only on general principles, *see* ¶ 20, *supra,* but also because we had the same opportunity to review the videotape of the defendant's statement as the trial court.

missible in evidence. Police may legitimately tell a suspect that cooperation will be passed on to the authorities and may increase the likelihood of leniency, but threatening to inform the prosecutor or the judge of a suspect's refusal to cooperate violates the Fifth Amendment right to remain silent. We must never forget that the reason courts suppress involuntary confessions is that

> the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial, and not an inquisitorial, system—a system in which the State must establish guilt by evidence independently and freely secured, and may not, by coercion, prove its charge against an accused out of his own mouth.

*Rogers v. Richmond*, 365 U.S. 534, 541, 81 S.Ct. 735, 739–40, 5 L.Ed.2d 760 (1961).

[¶ 33.] Admission of unlawfully obtained, even coerced, confessions can sometimes be harmless error. *Stanga*, 2000 SD 129 at ¶ 1, 617 N.W.2d at 487 (citation omitted). An erroneously admitted involuntary confession will not mandate reversal if there is sufficient untainted evidence of guilt to prove the offense beyond a reasonable doubt. *Arizona v. Fulminante*, 499 U.S. 279, 296, 306–12, 111 S.Ct. 1246, 1257–58, 113 L.Ed.2d 302, 322–23 (1991). The admission of Tuttle's statement here was not harmless error because the other evidence, including testimony from the victim, was not overwhelming, and cannot, given the issues of credibility for the jury, be said to prove Tuttle's guilt beyond a reasonable doubt as a matter of law. *Cf. Stanga*, 2000 SD 129 at ¶ 20, 617 N.W.2d at 491 (citation omitted).

[¶ 34.] Since we conclude that the State has not met its burden of proving by a preponderance of the evidence that Tuttle's confession was voluntary, and the admission of his confession at trial was not harmless, we reverse and remand for a new trial. We need not reach the second and third appeal issues.

[¶ 35.] Reversed and remanded for a new trial.

[¶ 36.] AMUNDSON, Justice, concurs.

[¶ 37.] GILBERTSON, Chief Justice, and SABERS and ZINTER, Justice, concur in part and dissent in part.

GILBERTSON, Chief Justice (concurring in part and dissenting in part).

[¶ 38.] I would not abandon this Court's traditional "totality of the circumstances" test in favor of a *per se* rule that would render all statements involuntary when they appear to result from what the defendant subjectively perceives to be a threat. There is a clear distinction between making threats or false promises to coerce a defendant's confession and simply apprising the defendant of all the facts so that he may make his decision of whether to cooperate in a knowing and intelligent manner. There is also a significant difference between remaining silent and lying to police to alleviate suspicion. Accordingly, I would affirm the trial court's admission of Tuttle's statement.

[¶ 39.] The essence of this inquiry is whether, under the totality of the circumstances, Tuttle's confession was coerced by the officer's statement. This Court claims the officer overcame Tuttle's will when he informed Tuttle "I'm gonna have to write it up that you're not cooperating, you're being a real jerk about it." However, the Court takes this statement out of context. The officer's entire comment, in response to Tuttle's repeated denials that he had anything to do with the stabbing, was as follows:

> O: Here's the problem T.J., okay. Here's the problem. And this is—I

can't make ya any deals. I can't make ya any promises. But this is the way it's gonna happen, okay. Everybody that's there—You know, I don't think there's a big conspiracy to get you in trouble, okay. But the facts are the facts as what happened. I can write it up one or two ways. I can say 'T.J. doesn't like this guy. He's beat up his mother, he's caused a lot of problems.' And for whatever reasons, ya accidentally stabbed this guy. Or I'm gonna have to write it up that you're not cooperating, you're being a real jerk about it. T.J.: Okay, I stabbed him. Whatever. Shit.

The officer's statement was not a threat, which overcame Tuttle's free will to remain silent.[12]

[¶ 40.] First, Tuttle's claim that he was threatened with more severe punishment if he exercised his Fifth Amendment rights is not plausible. He could not have understood the officer's comment about reporting Tuttle's failure to cooperate as a punishment for exercising his right to remain silent. This Court's opinion acknowledges that Tuttle had already voluntarily waived that right in speaking to the officer, well before the subject statement was made. In context, the remark was merely a warning of the consequences to Tuttle if he were to *lie* to the police.[13] There is no protected Fifth Amendment right to lie, only a right to remain silent. *United*

States v. Apfelbaum, 445 U.S. 115, 117, 100 S.Ct. 948, 950, 63 L.Ed.2d 250, 254 (1980) (holding "proper invocation of the Fifth Amendment privilege against compulsory self-incrimination allows a witness to remain silent, but not to swear falsely.").

[¶ 41.] Moreover, a defendant cannot be said to have made a knowing, intelligent and voluntary decision without being apprised of the consequences of his actions. *See, e.g., Deets,* 523 N.W.2d at 183. In *Deets,* the court held:

> [C]oercive conduct does not occur when, as here, an officer, without promising leniency, tells a defendant that if he or she does not cooperate the prosecutor will look upon the case differently. In either case, the officer does nothing other than predict what the prosecutor will do, without making a promise one way or the other.

*Id.* In *Deets,* the court determined the detective's statement was "a reasonable prediction," and "not a threat of penalty." *Id.* at 183, n.2. Likewise, the officer's statement herein of "the natural consequences" of Tuttle's choice not to cooperate no doubt influenced his decision to confess, but it could not have operated retroactively to induce Tuttle's waiver of his right to remain silent. Nor could this apprisal be deemed overly coercive. *See United States v. Ballard,* 586 F.2d 1060, 1063 (5thCir.1978) (holding it is proper,

12. Moreover, this exchange took place only twelve minutes after the officer read Tuttle a *Miranda* warning.

13. First, when confronted with Terry's statement that Tuttle had stabbed him, Tuttle maintained Terry could not be trusted. Tuttle claimed that when his mother had previously stabbed Terry, Terry had lied to police resulting in Tuttle's brother's incarceration. Tuttle declared the same thing was happening to him. Next, Tuttle avowed he could not have done the stabbing because he was outside

fighting with another man when it happened. Finally, when confronted with the statements of his mother and grandmother, Tuttle claimed they were lying to protect Terry because he was "Mom's boyfriend." After emphatically and repeatedly claiming he had nothing to do with the stabbing, the officer said "You've got yourself in a jam here. You're not being honest with me and you know it." In fact, Tuttle waived his right to remain silent only because he mistakenly believed he could lie his way out of trouble.

under certain circumstances, to "tell[ ] the appellant in a noncoercive manner of the realistically expected penalties."); *Commonwealth v. Damiano*, 14 Mass.App.Ct. 615, 441 N.E.2d 1046, 1050 (1982) (noting "a certain degree of coercion (in the sense of psychological or emotional pressure) is endemic to any system which asks a person to forgo certain rights in order to be spared certain penalties.").

[¶ 42.] Finally, today's ruling will have a chilling effect upon the ability of law enforcement to elicit confessions. "It is a fact of life for law enforcement that suspected criminals do not often readily volunteer incriminating evidence." *State v. Frazier*, 2001 SD 19, ¶ 23, 622 N.W.2d 246, 256. Under this Court's ruling, law enforcement officers will be forbidden from uttering any words of consequences, for fear a defendant's confession will become involuntary. But they are also forbidden to withhold information that may cause a defendant's confession to be unknowing and, again, involuntary. This "catch 22" position will severely limit law enforcement capabilities in solving crimes. Indeed, if we are to take the Supreme Court's 1964 ruling in *Malloy* to its most literal conclusion, as this Court advocates today, even plea bargains would be unconstitutional. *See* 378 U.S. at 7, 84 S.Ct. at 1493, 12 L.Ed.2d at 659.

[¶ 43.] Accordingly, I dissent.

[¶ 44.] I also join the special writing of Justice Zinter.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 45.] I concur except that I would also hold that the State has not proven a valid waiver of defendant's Miranda rights.

[¶ 46.] As indicated in the majority opinion, the "State must show that (1) the relinquishment of the defendant's rights was *voluntary* and (2) the defendant was *fully aware* that those rights *were being waived* and of the *consequences* of waiving them." (citation omitted) (emphasis added). The State has shown neither. In fact, the record shows that the defendant simply wanted to get out of the police department and stated at least five times that he did not want to waive his Miranda rights. The officer knew he was confused about understanding his rights and took advantage of the situation. (*See* detailed facts and the cases cited in the majority opinion). Tuttle did not knowingly, intelligently, and voluntarily waive his Miranda rights.

ZINTER, Justice (concurring in part and dissenting in part).

[¶ 47.] I concur, except for that portion of Issue C which concludes that Tuttle's admission was involuntary. The majority finds the admission involuntary because it concludes that Detective Openhowski used a "coercive" "threat" to overbear Tuttle's will to not speak. *Supra* at ¶ 25–32. I join in Chief Justice Gilbertson's dissent on that conclusion. I also write to express my views that: the videotape more than adequately supports the trial court's finding of a voluntary admission, the majority has inferred far too much from the 18 words used by the detective, and the majority's authorities should not apply to this case.

[¶ 48.] Preliminarily, it should be noted that the majority incorrectly concludes that the trial court did not address the question of the voluntariness of Tuttle's statements; but rather, in a "conclusory fashion" ruled that Tuttle's statements were voluntary. *Supra* at ¶ 29. In point of fact, the trial court conducted a suppression hearing and then recited a finding of fact that supported its denial of the motion.

[¶ 49.] The trial court denied the suppression motion because it found that *"at all times* the defendant expressed a willingness, even a desire, to talk to the police about what happened." (emphasis added). Although we conduct a de novo review of the ultimate issue of voluntariness, this finding that at a certain time and place this suspect actually expressed a "willingness, even a desire to talk to the police" is a subsidiary finding to which we should accord deference.[14]

[¶ 50.] Moreover, the trial court's subsidiary finding is well supported by the videotape of the entire interview. A review of the short videotape clearly reflects that after Tuttle waived his Miranda rights, he never expressed *any* reservation about speaking with the detective. On the contrary, Tuttle fully and freely conversed with the detective for several minutes, telling several versions of the incident before he gave the version the majority suppresses.

[¶ 51.] In my view, the majority simply infers far too much from the detective's statement. The majority declares that the detective's statement (1) sent Tuttle an "unmistakable message," that would (2) "discourage any leniency," (3) "meaning" that Tuttle "would likely suffer more severely for not confessing." *Supra* at ¶ 29. The majority also declares that "[t]he message was clear: if Tuttle failed to cooperate he would pay the consequences; he would be treated less favorably." *Supra* at ¶ 30. I do not agree that all of these deductions can be reasonably inferred from the officer's statement, and especially not from Tuttle's demeanor and responses that are reflected on the videotape.

[¶ 52.] It bears repeating that the 18 words at issue are the detective's statement, "I'm gonna have to write it up that you're not cooperating, you're being a real jerk about it." *Supra* at ¶ 25. In my judgment, when viewed in context, one cannot divine from this language the majority's "unmistakable message" that the detective's report would "discourage any leniency," *and* further, that this meant

---

14. *See* ¶ 20 of the majority opinion ("Although there are often subsidiary factual questions deserving deference, the voluntariness of a confession is ultimately a legal question.") (citing *Miller v. Fenton*, 474 U.S. 104, 116, 106 S.Ct. 445, 452–53, 88 L.Ed.2d 405, 414–15). The majority fails to consider this subsidiary finding in a light most favorable to the trial court as required in *State v. Anderson*, 2000 SD 45, ¶ 80, 608 N.W.2d 644, 667.

Furthermore, this required deference is not changed by the fact that the trial court's findings were based upon oral and documentary evidence (a videotape of the interview and the detective's live testimony). As the majority notes, we have often expressed our preference for findings of fact and conclusions of law in criminal cases. *See supra* at n.11, and *State v. Flegel*, 485 N.W.2d 210, 213 (S.D.1992). Although the Rules of Criminal Procedure (SDCL, Title 23A) have no explicit provision governing findings of fact and conclusions of law, the Rules of Criminal Procedure explicitly incorporate the civil rules in jury selection (SDCL §§ 23A–19–1, 23A–20–1), evidentiary matters (SDCL 23A–22–2), and implicitly in all other criminal matters if the civil rules are not inconsistent with SDCL, Title 23A. SDCL 23A–45–13. Because Civil Rule 52(a) (SDCL 15–6–52(a)), governing findings of fact and conclusions of law, is not inconsistent with the criminal rules, it provides guidance here. Under the 2000 amendments of Civil Rule 52(a), we no longer apply de novo review simply because findings of fact are based on documentary evidence. The 2000 amendments require that "findings of fact, whether based upon oral or documentary evidence, may not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Id.*, SL 2000, ch 91, § 1. This is especially true here, where the trial court's critical finding was based on the videotape and the detective's oral testimony at the suppression hearing.

"Tuttle would suffer more severely for not confessing."

[¶ 53.] It must also be remembered that "[t]he question is not whether the interrogators' statements were the cause of the confession[,] but whether those statements were *so manipulative or coercive* that they deprived [a defendant] of *his ability to make an unrestrained, autonomous decision* to confess." *State v. Owens*, 2002 SD 42, ¶ 52, 643 N.W.2d 735, 750 (emphasis in original) (quoting *State v. Smith*, 1998 SD 6, ¶ 8, 573 N.W.2d 515, 517). Although the majority weighs extrinsic elements for and against a finding of voluntariness, it fails to give sufficient weight to the entire context of the conversation and Tuttle's unequivocal demeanor that depicts his voluntary participation throughout this interview. Those closer contextual considerations reveal that under the totality of the circumstances, Tuttle was fully capable of resisting pressure and was voluntarily talking. They also reveal that the officer's statement at issue was not "coercive" police activity, *Connelly*, 479 U.S. at 167, 107 S.Ct. at 522, 93 L.Ed.2d at 484, that overbore Tuttle's will. *Haynes*, 373 U.S. at 513–14, 83 S.Ct. at 1343, 10 L.Ed.2d at 520–21.

[¶ 54.] Finally, the majority's reliance on *Tingle*, 658 F.2d 1332, *Brommel*, 56 Cal.2d 629, 364 P.2d 845, 15 Cal.Rptr. 909 (1961), *Harrison*, 34 F.3d 886, and *Matthews*, 601 So.2d 52 is factually and legally misplaced. *Tingle* is factually inapposite because that case was premised on acknowledged "improper influence" in threatening to deprive a young mother of her child in order to illicit cooperation. 658 F.2d at 1336. That misconduct, which caused Tingle to "sob," "noticeably shak[e]," and to continue to cry for at least 10 minutes before confessing, is absent in this case. *Id.* at 1334.

[¶ 55.] *Brommel, Harrison,* and *Matthews* are factually distinguishable because they all involved threats to use non-cooperation by the *judge or court* that would ultimately find guilt and sentence the defendant. For example, *Brommel* involved "extensive questioning" by teams of two to five officers over a period of six hours. 15 Cal.Rptr. 909, 364 P.2d at 846. During the course of that extensive interrogation, promises of leniency were made to motivate the confession. *Id.* at 847. The specific statements involved police threats that their reports would reflect that the accused was a "liar" and that consequently, he could "expect no leniency from *the court.*" *Id.* at 848 (emphasis added).

[¶ 56.] In *Harrison*, the police rhetorically suggested that they might inform "the court" that the defendant had not cooperated. 34 F.3d at 891. This was the controlling fact in the opinion because the 9th Circuit Court of Appeals specifically noted that the "improper conduct was the suggestion that [the police] might inform the court that [the defendant] had not cooperated." *Id.* In fact, the court noted that the defendant broke her silence "only after the agent asked whether [the defendant] thought it preferable if the *judge* were informed that [the defendant] had cooperated or not cooperated," and the defendant responded "that she thought it would be better if she talked to the agents and *they informed the judge* that she had cooperated." *Id.* at 892 (emphasis added).

[¶ 57.] *Matthews* involved even more egregious conduct. In that case, after the police made the statement cited by the majority ("I can go back and tell the district attorney [defendant] cooperated with me or I can go back and tell the district attorney that [defendant] did not cooperate with me."), the police went further and stated that "[w]e might cut you a deal . . . . it could make a lot of difference for you."

The police then concluded that the "judge" would know if the defendant failed to cooperate. *Matthews*, 601 So.2d at 52–53.

[¶ 58.] Thus, *Tingle, Brommel, Harrison* and *Matthews* all involved different police questioning where clearly improper threats were made to use a suspect's right to remain silent. Those threats involved taking children away from their mother or the improper use of the right to remain silent *by the judge or court that would be judging and sentencing the accused.* These cases go far beyond Detective's Openhowski's accurate explanation that was limited to possible *police* or possible *prosecutorial* consequences of cooperation and non-cooperation.

[¶ 59.] In addition to these factual distinctions, *Brommel, Harrison*, and *Matthews* are legally inapposite because those courts apply much more restrictive exclusionary rules.[15] Although professing to apply the totality of the circumstances rule in general, these courts actually apply some form of a per se rule of exclusion in this type of case. For example, *Brommel* reveals that California follows a more restrictive rule under which "any promise" of "leniency or advantage for the accused, if ... a motivating cause[16] of the confession," makes a confession involuntary. 15 Cal.Rptr. 909, 364 P.2d at 846–47. *See also Cahill II*, 22 Cal.App.4th at 311, 28

Cal.Rptr.2d at 10 (stating that "[i]t is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied") (citation omitted); *Cahill I*, 5 Cal.4th at 494, 853 P.2d at 1048, 20 Cal.Rptr.2d at 593 (reviewing the California cases applying this rule of per se exclusion if any promise of benefit or leniency is expressed or implied).

[¶ 60.] The 9th Circuit Court of Appeals and Alabama decisions are no different. *See Harrison*, 34 F.3d at 891 (stating "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor") (emphasis original); *Matthews*, 601 So.2d at 54 (stating "in order to be admissible a confession must be free and voluntary and cannot be the result of any direct or implied promises, *however slight*") (emphasis in original).

[¶ 61.] On the other hand, South Dakota utilizes the "totality of the circumstances" analysis rather than one of these per se rules of exclusion. *Frazier*, 2001 SD 19 at ¶ 20, 622 N.W.2d at 255. Consequently, our cases have permitted some degree of threat as long as the resulting statement was voluntary under the totality of the circumstances.[17] Because of these

---

15. *Tingle* also has no precedential value here because the 9th Circuit Court of Appeals merely commented in a footnote that it "disapproved" of informing a suspect that a failure to cooperate would be communicated to a prosecutor. 658 F.2d at 1336, n.5. The court did not, however, *hold* that the factually correct statements involved were improper as a matter of law. It also did not cite any authority supporting its "disapproval." We have also disapproved of such conduct but nevertheless permitted use of the statement if voluntary under the totality of the circumstances. *See State v. Lyons*, 269 N.W.2d 124 (S.D. 1978), *infra*, discussed in footnote 17.

16. We do not follow this "but for" causation analysis. *Owens*, 2002 SD 42 at ¶ 52, 643 N.W.2d at 750 (stating that "[t]he question is not whether the interrogators' statements were the cause of the confession, but whether those statements were so manipulative or coercive that they deprived [a defendant] of his ability to make an unrestrained, autonomous decision to confess."). *See also, supra* at ¶ 23.

17. For example, in *Lyons*, 269 N.W.2d 124, a police officer interviewed a suspect in a robbery. According to the defendant, the officer threatened that since the defendant and his wife's stories did not match, "that ... I was either getting in deeper and deeper and just

differences in jurisprudence and because of the differences in the police statements at issue, *Tingle, Brommel, Harrison and Matthews* have no application here.

[¶ 62.] It should be finally noted there is no doubt that police and prosecutors consider cooperation or non-cooperation routinely (and permissibly) in making prosecutorial decisions. This is simply a fact of life. *See also,* the authorities cited in Chief Justice Gilbertson's dissent, *supra,* at ¶ 41. Unfortunately, under the language of the majority decision, any negative police or prosecutorial consequence of non-cooperation is now barred from disclosure to a suspect. Consequently, the majority opinion will actually hinder a suspect's ability to make a fully informed, knowledgeable and intelligent decision: a decision that includes knowing how their cooperation or non-cooperation may be used by the police and prosecutor in exercising their prosecutorial duty.

[¶ 63.] The majority attempts to sidestep this undesirable result by permitting police to "tell a suspect that cooperation will be passed on to the authorities and may increase the likelihood of leniency, but threatening to inform the prosecutor . . . of a suspect's refusal to cooperate violates the 5th Amendment right to remain silent." *Supra* at ¶ 32. However, "both types of statements are simply different sides of the same coin: 'waive your rights and receive more favorable treatment' versus 'exercise your rights and receive less favorable treatment.'" *Harrison,* 34 F.3d at 891. In my judgment, this distinction, used by the majority and the 9th Circuit Court of Appeals, is a play on words that few, if any, suspects will discern. Either way a suspect in custody is only interested in receiving the best treatment. Consequently, this distinction means little and will add further confusion rather than further information for suspects who should make an informed decision to speak or not speak.

[¶ 64.] In the final analysis, this videotape shows that Tuttle was voluntarily speaking with the detective throughout the interview. Consequently, I would affirm the trial court.

---

making things worse, and then [the officer] started talking about my wife getting arrested." *Id.* at 125–126. Shortly thereafter, the defendant confessed to the robbery. Although like *Tingle* we "frowned upon" this type of indirect threat, we nevertheless looked at the totality of the circumstances and held that the officer's threats did not render the defendant's confession involuntary in that case. *Id.* at 126.