Justice Sotomayor,
with whom Justice Stevens, Justice Ginsburg, and Justice Breyer join, dissenting.
The Court concludes today that a criminal suspect waives his right to remain silent if, after sitting tacit and uncommunicative through nearly three hours of police interrogation, he utters a few one-word responses. The Court also concludes that a suspect who wishes to guard his right to remain silent against such a finding of “waiver” must, counterintuitively, speak — and must do so with sufficient precision to satisfy a clear-statement rule that construes ambiguity in favor of the police. Both propositions mark a substantial retreat from the protection against compelled self-incrimination that Miranda v. Arizona, 384 U. S. 436 (1966), has long provided during custodial interrogation. The broad rules the Court announces today are also trou *392 bling because they are unnecessary to decide this case, which is governed by the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U. S. C. § 2254(d). Because I believe Thomp-kins is entitled to relief under AEDPA on the ground that his statements were admitted at trial without the prosecution having carried its burden to show that he waived his right to remain silent; because longstanding principles of judicial restraint counsel leaving for another day the questions of law the Court reaches out to decide; and because the Court’s answers to those questions do not result from a faithful application of our prior decisions, I respectfully dissent.
I
We granted certiorari to review the judgment of the Court of Appeals for the Sixth Circuit, which held that Thompkins was entitled to habeas relief under both Miranda and Strickland v. Washington, 466 U. S. 668 (1984). 547 F. 3d 572 (2008). As to the Miranda claims, Thompkins argues first that through his conduct during the 3-hour custodial interrogation he effectively invoked his right to remain silent, requiring police to cut off questioning in accordance with Miranda and Michigan v. Mosley, 423 U. S. 96 (1975). Thomp-kins also contends his statements were in any case inadmissible because the prosecution failed to meet its heavy burden under Miranda of proving that he knowingly and intelligently waived his right to remain silent. The Sixth Circuit agreed with Thompkins as to waiver and declined to reach the question of invocation. 547 F. 3d, at 583-584, n. 4. In my view, even if Thompkins cannot prevail on his invocation claim under AEDPA, he is entitled to relief as to waiver. Because I would affirm the judgment of the Sixth Circuit on that ground, I would not reach Thompkins’ claim that he received constitutionally ineffective assistance of counsel.
The strength of Thompkins’ Miranda claims depends in large part on the circumstances of the 3-hour interrogation, *393 at the end of which he made inculpatory statements later introduced at trial. The Court’s opinion downplays record evidence that Thompkins remained almost completely silent and unresponsive throughout that session. One of the interrogating officers, Detective Helgert, testified that although Thompkins was administered Miranda warnings, the last of which he read aloud, Thompkins expressly declined to sign a written acknowledgment that he had been advised of and understood his rights. There is conflicting evidence in the record about whether Thompkins ever verbally confirmed understanding his rights.[1] The record contains no indication that the officers sought or obtained an express waiver.
As to the interrogation itself, Helgert candidly characterized it as “very, very one-sided” and “nearly a monologue.” App. 10a, 17a. Thompkins was “[pjeculiar,” “[s]ullen,” and “[generally quiet.” Id., at 149a. Helgert and his partner “did most of the talking,” as Thompkins was “not verbally communicative” and “[l]argely” remained silent. Id., at 149a, 17a, 19a. To the extent Thompkins gave any response, his answers consisted of “a word or two. A ‘yeah,’ or a ‘no,’ or T don’t know.’... And sometimes ... he simply sat down ... with [his] head in [his] hands looking down. Sometimes ... he would look up and make eye-contact would be the only response.” Id., at 23a-24a. After proceeding in this fashion for approximately 2 hours and 45 minutes, Helgert *394 asked Thompkins three questions relating to his faith in God. The prosecution relied at trial on Thompkins’ one-word answers of “yes.” See id., at 10a-lla.
Thompkins’ nonresponsiveness is particularly striking in the context of the officers’ interview strategy, later explained as conveying to Thompkins that “this was his opportunity to explain his side [of the story]” because “[everybody else, including [his] co-[d]efendants, had given their version,” and asking him “[w]ho is going to speak up for you if you don’t speak up for yourself?” Id., at 10a, 21a. Yet, Helgert confirmed that the “only thing [Thompkins said] relative to his involvement [in the shooting]” occurred near the end of the interview — i.e., in response to the questions about God. Id., at 10a-lla (emphasis added). The only other responses Helgert could remember Thompkins giving were that “ ‘[h]e didn’t want a peppermint’ ” and “ The chair that he was sitting in was hard.’ ” Id., at 152a. Nevertheless, the Michigan court concluded on this record that Thompkins had not invoked his right to remain silent because “he continued to talk with the officer, albeit sporadically,” and that he voluntarily waived that right, People v. Thompkins, No. 242478, (Feb. 3,2004), App. to Pet. for Cert. 75a.
Thompkins’ federal habeas petition is governed by AEDPA, under which a federal court may not grant the writ unless the state court’s adjudication of the merits of the claim at issue “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” or “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” §§ 2254(d)(1), (2).
The relevant clearly established federal law for purposes of § 2254(d)(1) begins with our landmark Miranda decision, which “g[a]ve force to the Constitution’s protection against compelled self-incrimination” by establishing “ ‘certain procedural safeguards that require police to advise criminal sus *395 pects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation,’ ” Florida v. Powell, 559 U. S. 50, 59 (2010) (quoting Duckworth v. Eagan, 492 U. S. 195, 201 (1989)). Miranda prescribed the now-familiar warnings that police must administer prior to questioning. See 384 U. S., at 479; ante, at 380. Miranda and our subsequent cases also require police to “respect the accused’s decision to exercise the rights outlined in the warnings.” Moran v. Burbine, 475 U. S. 412, 420 (1986). “If [an] individual indicates in any manner, at any time prior to or during questioning, that he -wishes to remain silent” or if he “states that he wants an attorney,” the interrogation “must cease.” 384 U. S., at 473-474.
Even when warnings have been administered and a suspect has not affirmatively invoked his rights, statements made in custodial interrogation may not be admitted as part of the prosecution’s case in chief “unless and until” the prosecution demonstrates that an individual “knowingly and intelligently waive[d] [his] rights.” Id., at 479; accord, ante, at 382. “[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.” Miranda, 384 U. S., at 475. The government must satisfy the “high standard] of proof for the waiver of constitutional rights [set forth in] Johnson v. Zerbst, 304 U. S. 458 (1938).” Ibid.
The question whether a suspect has validly waived his right is “entirely distinct” as a matter of law from whether he invoked that right. Smith v. Illinois, 469 U. S. 91, 98 (1984) (per curiam). The questions are related, however, in terms of the practical effect on the exercise of a suspect’s rights. A suspect may at any time revoke his prior waiver of rights — or, closer to the facts of this case, guard against the possibility of a future finding that he implicitly waived his rights — by invoking the rights and thereby requiring the police to cease questioning. Accord, ante, at 387-388.
*396 II
A
Like the Sixth Circuit, I begin with the question whether Thompkins waived his right to remain silent. Even if Thompkins did not invoke that right, he is entitled to relief because Michigan did not satisfy its burden of establishing waiver.
Miranda's discussion of the prosecution’s burden in proving waiver speaks with particular clarity to the facts of this ease and therefore merits reproducing at length:
“If [an] interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.... Since the State is responsible for establishing the isolated circumstances under which [an] interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.
“An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.” 384 U. S., at 475.
Miranda went further in describing the facts likely to satisfy the prosecution’s burden of establishing the admissibility of statements obtained after a lengthy interrogation:
“Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a state *397 ment is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege.” Id., at 476.
This Court’s decisions subsequent to Miranda have emphasized the prosecution’s “heavy burden” in proving waiver. See, e. g., Tague v. Louisiana, 444 U. S. 469, 470-471 (1980) (per curiam); Fare v. Michael C., 442 U. S. 707, 724 (1979). We have also reaffirmed that a court may not presume waiver from a suspect’s silence or from the mere fact that a confession was eventually obtained. See North Carolina v. Butler, 441 U. S. 369, 373 (1979).
Even in concluding that Miranda does not invariably require an express waiver of the right to silence or the right to counsel, this Court in Butler made clear that the prosecution bears a substantial burden in establishing an implied waiver. The Federal Bureau of Investigation had obtained statements after advising Butler of his rights and confirming that he understood them. When presented with a written waiver-of-rights form, Butler told the agents, “ ‘I will talk to you but I am not signing any form.’” 441 U. S., at 371. He then made inculpatory statements, which he later sought to suppress on the ground that he had not expressly waived his right to counsel.
Although this Court reversed the state-court judgment concluding that the statements were inadmissible, we quoted at length portions of the Miranda opinion reproduced above. We cautioned that even an “express written or oral statement of waiver of the right to remain silent or of the right to counsel” is not “inevitably... sufficient to establish waiver,” emphasizing that “[t]he question is... whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.” 441 U. S., at 373. Miranda, *398 we observed, “unequivocally said . . . mere silence is not enough.” 441 U. S., at 373. While we stopped short in Butler of announcing a per se rule that “the defendant’s silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights,” we reiterated that “courts must presume that a defendant did not waive his rights; the prosecution’s burden is great.” Ibid.[2]
Rarely do this Court’s precedents provide clearly established law so closely on point with the facts of a particular case. Together, Miranda and Butler establish that a court “must presume that a defendant did not waive his rights”; the prosecution bears a “heavy burden” in attempting to demonstrate waiver; the fact of a “lengthy interrogation” prior to obtaining statements is “strong evidence” against a finding of valid waiver; “mere silence” in response to questioning is “not enough”; and waiver may not be presumed “simply from the fact that a confession was in fact eventually obtained.” Miranda, supra, at 475-476; Butler, supra, at 372-373.2 [3]****8
*399 It is undisputed here that Thompkins never expressly waived his right to remain silent. His refusal to sign even an acknowledgment that he understood his Miranda rights evinces, if anything, an intent not to waive those rights. Cf. United States v. Plugh, 576 F. 3d 135, 142 (CA2 2009) (suspect’s refusal to sign waiver-of-rights form “constituted an unequivocally negative answer to the question . . . whether he was willing to waive his rights”). That Thompkins did not make the inculpatory statements at issue until after approximately 2 hours and 45 minutes of interrogation serves as “strong evidence” against waiver. Miranda and Butler expressly preclude the possibility that the inculpatory statements themselves are sufficient to establish waiver.
In these circumstances, Thompkins’ “actions and words” preceding the inculpatory statements simply do not evidence a “course of conduct indicating waiver” sufficient to carry the prosecution’s burden. See Butler, supra, at 373.* *[4] Al *400 though the Michigan court stated that Thompkins “sporadically” participated in the interview, App. to Pet. for Cert. 75a, that court’s opinion and the record before us are silent as to the subject matter or context of even a single question to which Thompkins purportedly responded, other than the exchange about God and the statements respecting the peppermint and the chair. Unlike in Butler, Thompkins made no initial declaration akin to “I will talk to you.” See also 547 F. 3d, at 586-587 (case below) (noting that the case might be different if the record showed Thompkins had responded affirmatively to an invitation to tell his side of the story or described any particular question that Thompkins answered). Indeed, Michigan and the United States concede that no waiver occurred in this case until Thompkins responded “yes” to the questions about God. See Tr. of Oral Arg. 7,30. I believe it is objectively unreasonable under our clearly established precedents to conclude the prosecution met its “heavy burden” of proof on a record consisting of three one-word answers, following 2 hours and 45 minutes of silence punctuated by a few largely nonverbal responses to unidentified questions.
B
Perhaps because our prior Miranda precedents so clearly favor Thompkins, the Court today goes beyond AEDPA’s deferential standard of review and announces a new general principle of law. Any new rule, it must be emphasized, is unnecessary to the disposition of this case. If, in the Court’s view, the Michigan court did not unreasonably apply our Miranda precedents in denying Thompkins relief, it should simply say so and reverse the Sixth Circuit’s judgment on that ground. “It is a fundamental rule of judicial restraint. . . that this Court will not reach constitutional questions in advance of the necessity of deciding them.” Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P. C., 467 U. S. 138, 157 (1984). Consistent with that rule, we have frequently declined to address questions beyond *401 what is necessary to resolve a case under AEDPA. See, e. g., Tyler v. Cain, 533 U. S. 656, 667-668 (2001) (declining to address question where any statement by this Court would be “dictum” in light of AEDPA’s statutory constraints on ha-beas review); cf. Wiggins v. Smith, 539 U. S. 510, 522 (2003) (noting that Williams v. Taylor, 529 U. S. 362 (2000), “made no new law” because the “case was before us on habeas review”). No necessity exists to justify the Court’s broad announcement today.
The Court concludes that when Miranda warnings have been given and understood, “an accused’s uncoerced statement establishes an implied waiver of the right to remain silent.” Ante, at 384. More broadly still, the Court states that, “[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.” Ante, at 385.
These principles flatly contradict our longstanding views that “a valid waiver will not be presumed . . . simply from the fact that a confession was in fact eventually obtained,” Miranda, 384 U. S., at 475, and that “[t]he courts must presume that a defendant did not waive his rights,” Butler, 441 U. S., at 373. Indeed, we have in the past summarily reversed a state-court decision that inverted Miranda’s antiwaiver presumption, characterizing the error as “readily apparent.” Tague, 444 U. S., at 470-471. At best, the Court today creates an unworkable and conflicting set of presumptions that will undermine Miranda’s goal of providing “concrete constitutional guidelines for law enforcement agencies and courts to follow,” 384 U. S., at 442. At worst, it overrules sub silentio an essential aspect of the protections Miranda has long provided for the constitutional guarantee against self-incrimination.
The Court’s conclusion that Thompkins’ inculpatory statements were sufficient to establish an implied waiver, ante, at *402 386-387, finds no support in Butler. Butler itself distinguished between a sufficient “course of conduct” and inculpa-tory statements, reiterating Miranda’s admonition that “ ‘a valid waiver will not be presumed simply from ... the fact that a confession was in fact eventually obtained.’” 441 U. S., at 373 (quoting Miranda, supra, at 475). Michigan suggests Butler’s silence “ Vhen advised of his right to the assistance of a lawyer,’ ” combined with our remand for the state court to apply the implied-waiver standard, shows that silence followed by statements can be a “‘course of conduct.’” Brief for Petitioner 26 (quoting Butler, supra, at 371). But the evidence of implied waiver in Butler was worlds apart from the evidence in this case, because Butler unequivocally said “I will talk to you” after having been read Miranda warnings. Thompkins, of course, made no such statement.
The Court also relies heavily on Burbine in characterizing the scope of the prosecution’s burden in proving waiver. Consistent with Burbine, the Court observes, the prosecution must prove that waiver was “ ‘voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation’” and “ ‘made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.’” Ante, at 382-383 (quoting 475 U. S., at 421). I agree with the Court’s statement, so far as it goes. What it omits, however, is that the prosecution also bears an antecedent burden of showing there was, in fact, either an express waiver or a “course of conduct” sufficiently clear to support a finding of implied waiver. Nothing in Burbine even hints at removing that obligation. The question in that case, rather, was whether a suspect’s multiple express waivers of his rights were invalid because police “misinformed an inquiring attorney about their plans concerning the suspect or because they failed to inform the suspect of the attorney’s efforts to reach him.” Id., at 420; see also Colorado v. Spring, 479 U. S. 564, 573 *403 (1987). The Court’s analysis in Burbine was predicated on the existence of waiver in fact.
Today’s dilution of the prosecution’s burden of proof to the bare fact that a suspect made inculpatory statements after Miranda warnings were given and understood takes an unprecedented step away from the “high standards of proof for the waiver of constitutional rights” this Court has long demanded. Miranda, supra, at 475; cf. Brewer v. Williams, 430 U. S. 387, 404 (1977) (“[CJourts indulge in every reasonable presumption against waiver”); Zerbst, 304 U. S., at 464. When waiver is to be inferred during a custodial interrogation, there are sound reasons to require evidence beyond inculpatory statements themselves. Miranda and our subsequent cases are premised on the idea that custodial interrogation is inherently coercive. See 384 U. S., at 455 (“Even without employing brutality, the ‘third degree’ or [other] specific strategems . .. the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals”); Dickerson v. United States, 530 U. S. 428, 435 (2000). Requiring proof of a course of conduct beyond the inculpatory statements themselves is critical to ensuring that those statements are voluntary admissions and not the dubious product of an overborne will.
Today’s decision thus ignores the important interests Miranda safeguards. The underlying constitutional guarantee against self-incrimination reflects “many of our fundamental values and most noble aspirations,” our society’s “preference for an accusatorial rather than an inquisitorial system of criminal justice”; a “fear that self-incriminating statements will be elicited by inhumane treatment and abuses” and a resulting “distrust of self-deprecatory statements”; and a realization that while the privilege is “sometimes a shelter to the guilty, [it] is often a protection to the innocent.” Wi-throw v. Williams, 507 U. S. 680, 692 (1993) (internal quotation marks omitted). For these reasons, we have observed, a criminal law system “which comes to depend on the ‘confes *404 sion’ will, in the long run, be less reliable and more subject to abuses than a system relying on independent investigation.” Ibid, (some internal quotation marks omitted). “By bracing against ‘the possibility of unreliable statements in every instance of in-custody interrogation/ ” Miranda’s prophylactic rules serve to “ ‘protect the fairness of the trial itself.’ ” 507 U. S., at 692 (quoting Johnson v. New Jersey, 384 U. S. 719, 730 (1966); Schneckloth v. Bustamonte, 412 U. S. 218, 240 (1973)). Today’s decision bodes poorly for the fundamental principles that Miranda protects.
Ill
Thompkins separately argues that his conduct during the interrogation invoked his right to remain silent, requiring police to terminate questioning. Like the Sixth Circuit, I would not reach this question because Thompkins is in any case entitled to relief as to waiver. But even if Thompkins would not prevail on his invocation claim under AEDPA’s deferential standard of review, I cannot agree with the Court’s much broader ruling that a suspect must clearly invoke his right to silence by speaking. Taken together with the Court’s reformulation of the prosecution’s burden of proof as to waiver, today’s novel clear-statement rule for invocation invites police to question a suspect at length — notwithstanding his persistent refusal to answer questions — in the hope of eventually obtaining a single inculpatory response which will suffice to prove waiver of rights. Such a result bears little semblance to the “fully effective” prophylaxis, 384 U. S., at 444, that Miranda requires.
A
Thompkins’ claim for relief under AEDPA rests on the clearly established federal law of Miranda and Mosley. In Miranda, the Court concluded that “[i]f [an] individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must *405 cease.... [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.” 384 U. S., at 473-474. In Mosley, the Court said that a “critical safeguard” of the right to remain silent is a suspect’s “‘right to cut off questioning.’” 423 U. S., at 103 (quoting Miranda, supra, at 474). Thus, “the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his ‘right to cut off questioning’ was ‘scrupulously honored.’” 423 U. S., at 104.[5]
Thompkins contends that in refusing to respond to questions he effectively invoked his right to remain silent, such that police were required to terminate the interrogation prior to his inculpatory statements. In Michigan’s view, Thompkins cannot prevail under AEDPA because this Court’s precedents have not previously established whether a suspect’s ambiguous statements or actions require the police to stop questioning. We have held that a suspect who has “‘invoked his right to have counsel present ... is not subject to farther interrogation by the authorities until counsel has been made available to him, unless [he] initiates further communication, exchanges, or conversations with the police.’” Maryland v. Shatzer, 559 U. S. 98, 104 (2010) (quoting Edwards v. Arizona, 451 U. S. 477, 484-485 (1981)). Notwithstanding Miranda’s statement that “there can be no questioning” if a suspect “indicates in any manner . . . that he wishes to consult with an attorney,” 384 U. S., at 444-445, the Court in Davis v. United States, 512 U. S. 452, 461 (1994), *406 established a clear-statement rule for invoking the right to counsel. After a suspect has knowingly and voluntarily waived his Miranda rights, Davis held, police may continue questioning “until and unless the suspect clearly requests an attorney.” 512 U. S., at 461 (emphasis added).
Because this Court has never decided whether Davis' clear-statement rule applies to an invocation of the right to silence, Michigan contends, there was no clearly established federal law prohibiting the state court from requiring an unambiguous invocation. That the state court’s decision was not objectively unreasonable is confirmed, in Michigan’s view, by the number of Federal Courts of Appeals to have applied Davis to invocation of the right to silence. Brief for Petitioner 44.
Under AJEDPA’s deferential standard of review, it is indeed difficult to conclude that the state court’s application of our precedents was objectively unreasonable. Although the duration and consistency of Thompkins’ refusal to answer questions throughout the 3-hour interrogation provide substantial evidence in support of his claim, Thompkins did not remain absolutely silent, and this Court has not previously addressed whether a suspect can invoke the right to silence by remaining uncooperative and nearly silent for 2 hours and 45 minutes.
B
The Court, however, eschews this narrow ground of decision, instead extending Davis to hold that police may continue questioning a suspect until he unambiguously invokes his right to remain silent. Because Thompkins neither said “he wanted to remain silent” nor said “he did not want to talk with the police,” the Court concludes, he did not clearly invoke his right to silence. Ante, at 380-382.[6]
*407 I disagree with this novel application of Davis. Neither the rationale nor holding of that case compels today’s result. Davis involved the right to counsel, not the right to silence. The Court in Davis reasoned that extending Edwards’ “rigid” prophylactic rule to ambiguous requests for a lawyer would transform Miranda into a “ ‘wholly irrational obstacle] to legitimate police investigative activity’” by “needlessly preventing] the police from questioning a suspect in the absence of counsel even if [he] did not wish to have a lawyer present.” Davis, supra, at 460. But Miranda itself “distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney.” Mosley, 423 U. S., at 104, n. 10; accord, Edwards, supra, at 485. Mosley upheld the admission of statements when police immediately stopped interrogating a suspect who invoked his right to silence, but reapproached him after a 2-hour delay and obtained inculpatory responses relating to a different crime after administering fresh Miranda warnings. The different effects of invoking the rights are consistent with distinct standards for invocation. To the extent Mosley contemplates a more flexible form of prophylaxis than Edwards — and, in particular, does not categorically bar police from reapproaching a suspect who has invoked his right to remain silent — Davis’ concern about “‘wholly irrational obstacles’ ” to police investigation applies with less force.
In addition, the suspect’s equivocal reference to a lawyer in Davis occurred only after he had given express oral and written waivers of his rights. Davis’ holding is explicitly predicated on that fact. See 512 U. S., at 461 (“We therefore hold that, after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney”). The Court ignores this aspect of Davis, as well as the decisions of numerous federal and state courts declining *408 to apply a dear-statement rule when a suspect has not previously given an express waiver of rights.[7]
In my mind, a more appropriate standard for addressing a suspect’s ambiguous invocation of the right to remain silent is the constraint Mosley places on questioning a suspect who has invoked that right: The suspect’s “ ‘right to cut off questioning’ ” must be “ ‘scrupulously honored.’ ” See 423 U. S., at 104. Such a standard is necessarily precautionary and fact specific. The rule would acknowledge that some statements or conduct are so equivocal that police may scrupulously honor a suspect’s rights without terminating questioning — for instance, if a suspect’s actions are reasonably understood to indicate a willingness to listen before deciding whether to respond. But other statements or actions — in particular, when a suspect sits silent throughout prolonged interrogation, long past the point when he could be deciding whether to respond — cannot reasonably be understood other than as an invocation of the right to remain silent. Under such circumstances, “scrupulous” respect for the suspect's rights will require police to terminate questioning under Mosley.[8]
*409 To be sure, such a standard does not provide police with a bright-line rule. Cf. ante, at 381-382. But, as we have previously recognized, Mosley itself does not offer clear guidance to police about when and how interrogation may continue after a suspect invokes his rights. See Solem v. Stumes, 465 U. S. 638, 648 (1984); see also Shatzer, 559 U. S., at 119 (Thomas, J., concurring in part and concurring in judgment). Given that police have for nearly 35 years applied Mosley’s fact-specific standard in questioning suspects who have invoked their right to remain silent; that our cases did not during that time resolve what statements or actions suffice to invoke that right; and that neither Michigan nor the Solicitor General has provided evidence in this case that the status quo has proved unworkable, I see little reason to believe today’s clear-statement rule is necessary to ensure effective law enforcement.
Davis’ clear-statement rule is also a poor fit for the right to silence. Advising a suspect that he has a “right to remain silent” is unlikely to convey that he must speak (and must do so in some particular fashion) to ensure the right will be protected. Cf. Soffar v. Cockrell, 300 F. 3d 588, 603 (CA5 2002) (en banc) (DeMoss, J., dissenting) (“What in the world must an individual do to exercise his constitutional right to remain silent beyond actually, in fact, remaining silent?”). By contrast, telling a suspect “he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires,” Miranda, 384 U. S., at 479, implies the need for speech to exercise that right. Davis’ requirement that a suspect must “clearly requesft] an attorney” to terminate questioning thus aligns with a suspect’s likely understanding of the Miranda warnings in a way today’s rule does not. 512 U. S., at 461. The Court suggests Thompkins could have employed the “simple, unambiguous” means of saying “he wanted to remain silent” or “did not want to talk with the police.” Ante, at 382. But the Miranda warnings give no *410 hint that a suspect should use those magic words, and there is little reason to believe police — who have ample incentives to avoid invocation — will provide such guidance.
Conversely, the Court’s concern that police will face “difficult decisions about an accused’s unclear intent” and suffer the consequences of “ ‘guess[ing] wrong,’ ” ante, at 382 (quoting Davis, 512 U. S., at 461), is misplaced. If a suspect makes an ambiguous statement or engages in conduct that creates uncertainty about his intent to invoke his right, police can simply ask for clarification. See id., at 467 (Souter, J., concurring in judgment). It is hardly an unreasonable burden for police to ask a suspect, for instance, “Do you want to talk to us?” The majority in Davis itself approved of this approach as protecting suspects’ rights while “minimiz[ing] the chance of a confession [later] being suppressed.” Id., at 461. Given this straightforward mechanism by which police can “scrupulously hono[r]” a suspect's right to silence, today’s clear-statement rule can only be seen as accepting “as tolerable the certainty that some poorly expressed requests [to remain silent] will be disregarded,” id., at 471 (opinion of Souter, J.), without any countervailing benefit. Police may well prefer not to seek clarification of an ambiguous statement out of fear that a suspect will invoke his rights. But “our system of justice is not founded on a fear that a suspect will exercise his rights. ‘If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system.’” Burbine, 475 U. S., at 458 (Stevens, J., dissenting) (quoting Escobedo v. Illinois, 378 U. S. 478, 490 (1964)).
The Court asserts in passing that treating ambiguous statements or acts as an invocation of the right to silence will only “‘marginally’” serve Miranda’s goals. Ante, at 382. Experience suggests the contrary. In the 16 years sinee Davis was decided, ample evidence has accrued that criminal suspects often use equivocal or colloquial language in attempting to invoke their right to silence. A number of *411 lower courts that have (erroneously, in my view) imposed a clear-statement requirement for invocation of the right to silence have rejected as ambiguous an array of statements whose meaning might otherwise be thought plain.[9] At a minimum, these decisions suggest that differentiating “clear” from “ambiguous” statements is often a subjective inquiry. Even if some of the cited decisions are themselves in tension with Davis’ admonition that a suspect need not “ ‘speak with the discrimination of an Oxford don’” to invoke his rights, *412 512 U. S., at 459 (quoting id., at 476 (opinion of Souter, J.)), they demonstrate that today’s decision will significantly burden the exercise of the right to silence. Notably, when a suspect “understands his (expressed) wishes to have been ignored ... in contravention of the ‘rights’ just read to him by his interrogator, he may well see further objection as futile and confession (true or not) as the only way to end his interrogation.” Id., at 472-473.
For these reasons, I believe a precautionary requirement that police “scrupulously hono[r]” a suspect’s right to cut off questioning is a more faithful application of our precedents than the Court’s awkward and needless extension of Davis.
* * *
Today’s decision turns Miranda upside down. Criminal suspects must now unambiguously invoke their right to remain silent — which, counterintuitively, requires them to speak. At the same time, suspects will be legally presumed to have waived their rights even if they have given no clear expression of their intent to do so. Those results, in my view, find no basis in Miranda or our subsequent cases and are inconsistent with the fair-trial principles on which those precedents are grounded. Today's broad new rules are all the more unfortunate because they are unnecessary to the disposition of the case before us. I respectfully dissent.

 At the suppression hearing, Detective Helgert testified that after reading Thompkins the warnings, “I believe I asked him if he understood the Rights, and I think I got a verbal answer to that as a ‘yes.’” App. 9a, In denying the motion to suppress, the trial court relied on that factual premise. Id., at 26a. In his later testimony at trial, Helgert remembered the encounter differently. Asked whether Thompkins “indicate[d] that he understood [the warnings]” after they had been read, Helgert stated “I don’t know that I orally asked him that question.” Id., at 148a. Nevertheless, the Michigan Court of Appeals stated that Thompkins verbally acknowledged understanding his rights, People v. Thompkins, No. 242478 (Feb. 3, 2004), App. to Pet. for Cert. 75a

 The Court dtes Colorado v. Connelly, 479 U. S. 157, 168 (1986), for the proposition that the prosecution’s “‘heavy burden’” under Miranda “is not more than the burden to establish waiver by a preponderance of the evidence.” Ante, at 384. Connelly did rejeet a dear and convincing evidence standard of proof in favor of a preponderance burden. But nothing in Connelly displaced the core presumption against finding a waiver of rights, and we have subsequently relied on Miranda’s characterization of the prosecution’s burden as "heavy.” See Arizona v. Roberson, 486 U. S. 675, 680 (1988).

 Likely reflecting the great weight of the prosecution’s burden in proving implied waiver, many contemporary police training resources instruct officers to obtain a waiver of rights prior to proceeding at all with an interrogation. See, e. g., F. Inbau, J. Reid, J. Buckley, & B. Jayne, Criminal Interrogation and Confessions 491 (4th ed. 2004) (hereinafter Inbau) (“Once [a] waiver is given, the police may proceed with the interrogation”); D. Zulawski & D. Wicklander, Practical Aspects of Interview and Interrogation 55 (2d ed. 2002) (“Only upon the waiver of th[e] [Miranda] rights by the suspect can an interrogation occur”); see also Brief for National *399 Association of Criminal Defense Lawyers et al. as Amici Curiae 11-12 (hereinafter NACDL Brief) (collecting authorities).

 Although such decisions are not controlling under AEDPA, it is notable that lower courts have similarly required a showing of words or conduct beyond inculpatory statements. See, e. g., United States v. Wallace, 848 F. 2d 1464, 1475 (CA9 1988) (no implied waiver when warned suspect “maintained her silence for ... perhap[s] as many as ten minutes” before answering a question); McDonald v. Lucas, 677 F. 2d 518, 521-522 (CA5 1982) (no implied waiver when defendant refused to sign waiver and there was “no evidence of words or actions implying a waiver, except the [inculpatory] statement”). Generally, courts have found implied waiver when a warned suspect has made incriminating statements “as part of a steady stream of speech or as part of a back-and-forth conversation with the police,” or when a warned suspect who previously invoked his right “spontaneously recommences the dialogue with his interviewers.” Bui v. DiPaolo, 170 F. 3d 232, 240 (CA1 1999) (citation and internal quotation marks omitted); see also United States v. Smith, 218 F. 3d 777, 781 (CA7 2000) (implied waiver where suspect “immediately began talking to the agents after refusing to sign the waiver form and continued to do so for an hour”); United States v. Scarpa, 897 F. 2d 63, 68 (CA2 1990) (implied waiver where warned suspect engaged in a ‘“relaxed and friendly”’ conversation with officers during a 2-hour drive).

In holding that Mosley’s right had been ‘“scrupulously honored,’” the Court observed that he was properly advised of his rights and indicated his understanding in writing; that police “immediately ceased” interrogation when Mosley stated he did not want to discuss the crime and allowed an “interval of more than two hours” to pass before reapproaching Mosley “at another location about an unrelated [crime]”; and that Mosley was re-administered “full and complete Miranda warnings at the outset of the second interrogation” and had a “full and fair opportunity to exercise th[o]se options.” 423 U. S., at 103-105.

 The Court also ignores a second available avenue to avoid reaching the constitutional question. Because the Sixth Circuit declined to decide Thompkins’ invocation claim, a remand would permit the lower court to *407 address the question in the first instance. Cf. Cutter v. Wilkinson, 544 U. S. 709, 718, n. 7 (2005).

 See, e. g., United States v. Plugh, 576 F. 3d 135, 143 (CA2 2009) (“Davis only provides guidance . . . [when] a defendant makes a claim that he subsequently invoked previously waived Fifth Amendment rights”); United States v. Rodriguez, 518 F. 3d 1072, 1074 (CA9 2008) (Davis' “‘clear statement’ ” rule “applies only after the police have already obtained an unambiguous and unequivocal waiver of Miranda rights”); State v. Tuttle, 2002 SD 94, ¶ 14, 650 N. W. 2d 20, 28; State v. Holloway, 2000 ME 172, ¶ 12, 760 A. 2d 223, 228; State v. Leyva, 951 P. 2d 738, 743 (Utah 1997).

 Indeed, this rule appears to reflect widespread contemporary police practice. Thompkins’ amici collect a range of training materials that instruct police not to engage in prolonged interrogation after a suspect has failed to respond to initial questioning. See NACDL Brief 32-34. One widely used police manual, for example, teaches that a suspect who “indicates,” “even by silence itself,” his unwillingness to answer questions “has obviously exercised his constitutional privilege against self-incrimination.” Inbau 498.

 See United States v. Sherrod, 445 F. 3d 980, 982 (CA7 2006) (suspect’s statement “‘I’m not going to talk about nothin’ ’” was ambiguous, “as much a taunt — even a provocation — as it [was] an invocation of the right to remain silent”); Burket v. Angelone, 208 F. 3d 172, 200 (CA4 2000) (upholding on AEDPA review a state court’s conclusion that ‘“I just don’t think that I should say anything’ ” was not a clear request to remain silent); State v. Jackson, 107 Ohio St. 3d 300, 310, 2006-Ohio-l, ¶¶ 96-98, 839 N. E. 2d 362, 373 (finding ambiguous “T don’t even like talking about it man ... I told you . . . what happened, man ... I mean, I don’t even want to, you know what I’m saying, discuss no more about it, man’ ”); State v. Speed, 265 Kan. 26, 37-38, 961 P. 2d 13, 24 (1998) (finding ambiguous “‘[a]nd since we’re not getting anywhere I just ask you guys to go ahead and get this over with and go ahead and lock me up and let me go and deal with Sedgwick County, I’m ready to go to Sedgwick County, let's go’”); State v. Markwardt, 2007 WI App 242, ¶ 1,306 Wis. 2d 420, 424, 742 N. W. 2d 546, 548 (“ ‘Then put me in jail. Just get me out of here. I don't want to sit here anymore, alright? I’ve been through enough today' ” ambiguous because it could be construed as part of “‘thrust-and-parry’” between suspect and interrogator); State v. Deen, 42, 403, pp. 2-4 (La. App. 4/27/07), 953 So. 2d 1057, 1058-1060 (‘“Okay, if you’re implying that I’ve done it, I wish to not say any more. I’d like to be done with this. Cause that's just ridiculous. I wish I’d ... don’t wish to answer any more questions’” ambiguous because conditioned on officer’s implication that suspect committed specific assault). Courts have also construed statements as expressing a desire to remain silent only about a particular subject. See, e. g., People v. Silva, 45 Cal. 3d 604, 629-630, 754 P. 2d 1070, 1083-1084 (1988) (“ T really don’t want to talk about that’ ” only conveyed unwillingness to discuss certain subjects). See generally Strauss, The Sounds of Silence: Reconsidering the Invocation of the Right to Remain Silent Under Miranda, 17 Wm. & Mary Bill Rights J. 773, 788-802 (2009) (surveying cases).